IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA

Plaintiff

vs

MIC DAIRY, INC.
CARLOS ALBERTO DORTA-DIAZ
IVAN FELIPE DORTA-DIAZ
JOSE MIGUEL DORTA-DIAZ
EFREN T. IRIZARRY-COLON, ESQ.
ISMAEL L. ALFONZO-REYES
VANESSA MORALES-HERNANDEZ
and the conjugal partnership constituted by both

Defendants
_____

EFREN T. IRIZARRY-COLON, ESQ.

Third-Party Plaintiff

vs

FERNANDO TOLEDO-FERNANDEZ, his wife ZOILA BORGES-ALICEA, and their conjugal partnership
JOSE TORRES-CORREA, his wife, JANE DOE, and their conjugal partnership
FULANO and SUTANO

Third-Party Defendants
_____

EFREN T. IRIZARRY-COLON, ESQ.

Counter-claimant

vs

UNITED STATES OF AMERICA

Counter-defendant

CIVIL 05-1613CCC

CIVIL 05-1613CCC                                                    2

# O R D E R

On June 8, 2005, the United States filed this action under the False Claims Act (FCA), 31 U.S.C. §3729 et seq., the Financial Institution Reform Recovery And Enforcement Act (FIRREA), 12 U.S.C. §1833a and 18 U.S.C. §1014, and common law, to recover damages and civil penalties from defendants MIC Dairy, Inc., Carlos Alberto Dorta-Díaz, Iván Felipe Dorta-Díaz, José Miguel Dorta-Díaz, Efrén T. Irizarry-Colón, Ismael L. Alfonzo-Reyes and Vanessa Morales-Hernández because of false and fraudulent claims and/or false and fraudulent statements made in violation of federal and common law in support of or in relation to an application for an emergency loan and application for indemnity under the Livestock Indemnity Program granted by the United States Department of Agriculture, Farm Service Agency (FSA), for alleged losses sustained as a result of Hurricane Georges. Summons were served upon co-defendants Ismael L. Alfonzo-Reyes (Alfonzo) and Vanessa Morales-Hernández (Morales) personally on July 13, 2005 (see docket entries 23 & 24). On August 1, 2005, co-defendants Alfonzo and Morales requested an extension of time to file an answer (docket entry 22), which was granted on September 6, 2005. On August 30, 2005, co-defendants Alfonzo and Morales requested a second extension of time to file an answer (docket entry 28), which was denied on December 22, 2005 (docket entry 30). The final due date for co-defendants Alfonso and Morales to file their answer to the complaint was September 8, 2005. On December 29, 2005, the United States requested the entry of default against co-defendants Alfonzo, Morales and the conjugal partnership constituted by both (docket entry 31). On January 11, 2006, the Court entered the default of co-defendants Alfonzo, Morales and the conjugal partnership constituted by both (docket entry 32). Before the Court now is the Motion for Judgment by Default as to Co-defendants Alfonzo, Morales and the Conjugal Partnership Constituted by Both filed by the United States on June 22, 2006 (**docket entry 33**), and its accompanying Memorandum of Law in Support (**docket entry 34**). As it appears from the record that default was entered on both co-defendants for their failure to answer or otherwise plead in this case, and after having reviewed the allegations contained in the Complaint and in the Motion for Judgment

CIVIL 05-1613CCC                                        3

by Default, which have been supported by uncontested documentary evidence, we FIND that plaintiff is entitled to Judgment by Default under Rule 55 (b)(2) of the Federal Rules of Civil Procedure, and we now enter our findings and conclusions.

I. THE FACTS

The following facts, taken from the complaint, have not been contested by co-defendants Alfonzo, Morales and the conjugal partnership constituted by both.

Defendant, MIC Dairy, Inc. (MIC Dairy), was at all times relevant a corporation organized under the laws of the Commonwealth of Puerto Rico, dedicated to the business of milk production. Defendants, Carlos Alberto Dorta-Díaz (Carlos Dorta), Iván Felipe Dorta-Díaz (Iván Dorta), and José Miguel Dorta-Díaz (José Dorta), were at all times relevant dairy farmers in the Arecibo region of Puerto Rico, officers and stockholders of MIC Dairy. Defendant Alfonzo was at all times relevant a resident of Puerto Rico, employed by the FSA as Farm Loan Manager assigned to the Ponce office until May 9, 1999, when he was transferred to the Arecibo Office. Defendant Morales was at all times relevant married to Alfonzo, and worked under contract with the FSA as a loan packager, i.e. a person paid by FSA to help farmers put together an application for loans with the agency, free of charge to the borrowers. At times pertinent Morales also worked independently of FSA, charging the borrowers a percentage of the loan for her services.

On September 24, 1998, the President of the United States declared that a major disaster existed in the Commonwealth of Puerto Rico, based on the damages resulting from Hurricane Georges, which occurred on September 21, 1998. This disaster declaration resulted in the availability of emergency loans at low interest rates, as well as free monetary awards for fence damages and cattle losses, all provided by the FSA. The maximum an individual or related entity can receive from an emergency loan is $500,000.

On or about October 13, 1998 at El Buen Café Restaurant in Hatillo, Puerto Rico, Fernando Toledo-Fernández (Toledo-Fernández), co-defendant Alfonzo and José Torres-Correa (Torres-

CIVIL 05-1613CCC                                                  4

Correa), met and discussed the process of applying, processing and obtaining emergency and operating loans from FSA for Toledo-Fernández and his family corporations as well as for other cattlemen from the Arecibo region. Toledo-Fernández was at all times relevant a cattleman in the Arecibo region of Puerto Rico, and the owner and in control of various family corporations. Torres-Correa was at all times relevant the Farm Loan Director of FSA in Puerto Rico.

On or about October 13, 1998, Alfonzo offered a kickback of approximately one hundred thirty thousand dollars ($130,000.00) to Torres-Correa, for expediting, approving, and disbursing emergency and operating loans from FSA to approximately twelve (12) to fifteen (15) cattlemen from the Arecibo region. On or about the same date co-defendant Alfonzo agreed that his wife Morales be recruited to serve as a loan packager to prepare the loan applications for a group of cattlemen from the Arecibo region. On or about the same date, Alfonzo agreed that a 4% percent commission would be charged to each dairy farmer to process their loan applications, from which he, his wife and Torres-Correa would receive a share of two percent (2%) of the loan amounts. On or about the same date, it was agreed by Toledo-Fernandez and co-defendant Alfonzo that Toledo-Fernández would be in charge of recruiting cattlemen to seek emergency and operating loans from FSA.

In or about October 1998, Toledo-Fernández invited family members and other cattlemen from the Arecibo region to his home in order to offer the services of an attorney for the purpose of preparing and expediting applications, and the disbursement of emergency and operating loans to be obtained from FSA. On that same date, co-defendant Alfonzo went to the residence of Toledo-Fernández, spoke to the group of cattlemen, and explained the emergency and operating loans available from FSA. At that meeting, Alfonzo introduced his wife, Morales, as an FSA authorized loan packager that would be working with the attorney that Toledo-Fernández introduced to the group.

From in or about September 1998 to January 2000, co-defendant MIC Dairy submitted a loan application to FSA in order to obtain an emergency loan to compensate for the losses suffered

CIVIL 05-1613CCC                                              5

as the result of Hurricane Georges. From in or about September 1998 to January 2000, Morales submitted false information in support of the loan application of MIC Dairy to FSA in order to obtain an emergency loan for $500,000. Such false information submitted by Morales to FSA to support the loan application of MIC Dairy consisted in false Certification of Losses, which contained false and or inflated information as to the physical losses of dairy cattle, damages to farm fences, debris removal and damages to structures on account of Hurricane Georges, and other false documents, letters and certifications to support these losses, and Requests for Lender Verification of Loan Application from several commercial financial institutions which contained false information to support their loan application with FSA. From in or about October 1998 to January 2000, co-defendant Alfonzo, while being the Farm Loan Manager for the Ponce field office of FSA, and after his transfer to the Arecibo field office of FSA, personally worked on the loan application documents of co-defendant MIC Dairy that his wife had prepared as loan packager.

Between September 1998 and October 1999, co-defendants Alfonzo and Morales knowingly presented, or caused to be presented, false or fraudulent loan applications, running records, forms, documents, vouchers, invoices, records, certification of losses, loan verifications, financial statements, and other documents, statements, and/or records that were used by FSA to submit, process, authorize, approve, grant and/or pay an emergency loan for $500,000 to MIC Dairy. With respect to the false information presented or caused to be presented to FSA in support of this $500,000 loan application, Alfonzo and Morales had either actual knowledge of the said false information, and/or acted in deliberate ignorance of the truth or falsity of said information, and/or acted in reckless disregard of the truth or falsity of said information.

In or about March, 1999, Torres-Correa, suggested to the State Executive Director of FSA in Puerto Rico that he transfer Alfonzo from the FSA field office in Ponce to the FSA field office in Arecibo. Sometime after May 9, 1999, but prior to September 24, 1999, Alfonzo, as Farm Loan Manager and County Supervisor of the Arecibo office of FSA, requested from Torres-Correa that he approve and authorize for disbursement the loan applications of co-defendant MIC Dairy. On

CIVIL 05-1613CCC                                        6

June 9, 1999, Alfonzo, as FSA Loan Manager in Arecibo, falsely certified that the losses and damages claimed by co-defendant MIC Dairy on their emergency loan application documents were reasonable and of sufficient magnitude to qualify them for an emergency loan.  On June 9, 1999, Torres-Correa, as Farms Program Director of FSA in Puerto Rico, approved and authorized the disbursement of an emergency loan for $500,000 to co-defendant MIC Dairy, which loan documents contained false information.

On August 31, 1999, the United States Treasury issued a check in the amount of $500,000 to the order of co-defendant MIC Dairy. This check was delivered to the closing attorney, who endorsed and deposited the same into an interest bearing bank account of his law office.

On October 8, 1999, co-defendants Carlos Dorta, Iván Dorta and José Dorta appeared at the legal office of co-defendant Efrén T. Irizarry-Colón (Irizarry) for the closing of the MIC Dairy emergency loan and disbursement of the loan funds. On that same date, Irizarry disbursed the loan funds corresponding to the MIC Dairy emergency loan of $500,000, by issuing a check for $400,000 payable to Scotiabank, and another for $100,000 payable to MIC Dairy.  Morales was paid $9,370.00 for her participation in preparing emergency loan applications packages with false information for MIC Dairy.

From in or about August 1999 to March 2000, Alfonzo and Morales paid approximately $18,000.00 in cash to Torres-Correa, for his role in expediting, approving and authorizing disbursements of various loans to cattlemen in the Arecibo region of Puerto Rico, including co-defendant MIC Dairy.  At different times during the existence of this conspiracy, Alfonzo assured Torres-Correa that he did not have to pay a $50,000 debt he had with Alfonzo in exchange for his role in expediting, approving and authorizing disbursements of various loans to cattlemen in the Arecibo region of Puerto Rico, including co-defendants MIC Dairy.

With respect to the false and fraudulent information presented or caused to be presented to FSA related to the loan closings, and the payment of kickbacks to Torres-Correa, co-defendants

CIVIL 05-1613CCC                                        7

Alfonzo and Morales had either actual knowledge of said false information and kickbacks, and/or acted in deliberate ignorance of the truth or falsity of said information and kickbacks, and/or acted in reckless disregard of the truth or falsity of said information and kickbacks.  On or about October 10, 2000, co-defendant Alfonzo knowingly presented, or caused to be presented, false or fraudulent applications, records, forms, documents, vouchers, invoices, certification of losses, and other documents, statements, and/or records that were used by FSA to submit, process, authorize, approve, grant and/or pay free livestock indemnity monies in the amount of $13,534 to MIC Dairy. The false statement consisted in that Alfonzo claimed that MIC Dairy had lost certain number of cows and heifers as a consequence of Hurricane Georges when they well knew that this information was false.

The monetary awards for indemnity losses were disbursed by FSA through different programs, including the Livestock Indemnity Program.  Funds awarded from this program were provided free of charge to qualified farmers.

On December 22, 2004, Alfonzo and Morales were found guilty by a jury on numerous counts of false statements, bank fraud, conspiracy and bribery in relation to the FSA loans related to the Hurricane Georges disaster, all of which were processed for approval on June 9, 1999, the same date in which the MIC Dairy emergency loan was approved .

On March 18, 2005, Toledo-Fernández plead guilty to a count of conspiracy and a count of loan fraud (18 USC §1014) for knowingly making false statements or reports to obtain the FSA loans related to the Hurricane Georges disaster, all of which were approved on June 9, 1999, the same date in which the MIC Dairy emergency loan was approved.

II.    THE FALSE CLAIMS ACT

Plaintiff contends that judgment by default should be entered in its favor under the False Claims Act (31 U.S.C. §3729 et seq.)  The False Claims Act establishes seven acts, each of which

CIVIL 05-1613CCC                                          8

constitutes a basis for liability. 31 U.S.C. §3729(a). The most common provisions impose liability on any person who:

 (1) knowingly presents, or causes to be presented to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;

 (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;

 (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid;

 (4) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government. 31 U.S.C.§3729(a).

 In addition, the False Claims Act, 31 U.S.C. §3729(b), provides that:

For the purpose of this section, the term "knowing" and "knowingly" means that a person, with respect to information

 (1) had actual knowledge of the information;

 (2) acts in deliberate ignorance of the truth or falsity of the information; or

 (3) acts in reckless disregard of the truth or falsity of the information,

and no proof of specific intent to defraud is required. (Emphasis added.)

 The case law construing 31 U.S.C. §3729(b) affirms the clear language of the statute and the intentions of Congress that "no proof of specific intent to defraud is required." <u>U.S. v. Cabrera-Díaz,</u> 106 F. Supp. 2d 234, 239 (D.P.R. 2000). As stated in <u>Cabrera-Díaz</u>, the False Claims Act provides that any person who violates its provisions is liable to the United States for "a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. §3729(a). Persons violating the Act are also liable for the cost of litigation. <u>Id.</u>

CIVIL 05-1613CCC                                                    9

      While there is no set formula for measuring damages under the False Claims Act, the courts have adopted as a general rule that "[t]he measure of the government's damages [is] the amount that it paid out by reason of the false statements over and above what it would have paid if the claims had been truthful." <u>United States v. Woodbury</u>, 359 F.2d 370, 379 (9th Cir. 1966); <u>accord</u> <u>United States v. TDC Management Corporation</u>, 288 F.3d 421, 428 (D.C. Cir. 2002) ("measure of damages [is] based on what the government would have paid out had it known of the information that [defendant] omitted"); <u>United States v. Cabrera-Díaz</u>, 106 F. Supp.2d 234 (D.P.R. 2000) (damages are "the amount the Government would not have paid had it known the true facts"); <u>United States ex rel. Roby v. Boeing Co.</u>, 79 F. Supp. 877 (S.D. Ohio 1999) ("A court should ask the question, 'How much would the government have paid for the item at issue 'but for' the fraudulent actions of the defendant ?'")

      This rule of damages was confirmed by the Supreme Court nearly sixty years ago in <u>U.S. ex rel. Marcus v. Hess</u>, 317 U.S. 537 (1943), which involved collusive bidding on a government contract. The trial court held that the measure of damages was "the money which the Government contributed to each project in excess of what it would have paid, had there been fair and open competition." 41 F. Supp. 197, 214 (W.D. Pa. 1941). The Supreme Court affirmed the district court's ruling, observing that the "chief purpose of the [FCA] was to provide for restitution to the government of money taken from it by fraud." 317 U.S. at 551.

      In <u>TDC</u>, the D.C. Circuit relied upon the Supreme Court's decision in <u>Hess</u> to reject an argument similar to that advanced by some of the defendants here. The TDC defendants had been hired by the government to develop a minority bonding program. The government brought a FCA action against the defendants after discovering that they had failed to comply with the program's conflict of interest rules. In the trial court, the defendants argued that the government suffered no damages despite their conflict of interest because the government got the program it paid for. In rejecting that argument, the trial court held that the proper question in determining damages is: "How much would the government have paid for the item at issue 'but for' the fraudulent actions

CIVIL 05-1613CCC                                    10

of the defendant ?" United States v. TDC Management Corp. et al., CA No. 89-1533, at 11 (Feb. 6, 2001) (quoting Roby, 79 F. Supp.2d at 877) (appended as Attachment A). The trial court concluded: "Had the Government been aware of the program deviations, it would not have continued to expend funds on the minority bonding program. Therefore, [defendant] is liable for damages on all submitted vouchers starting with the first fraudulent voucher . . ." Id. at 12. The D.C. Circuit affirmed the trial court's decision, concluding that it was consistent with the standard in Hess and that it "properly applied a 'but for' measure of damages based on what the government would have paid out had it known of the information that [defendant] omitted." TDC, 288 F.3d at 428.

A similar damage rule was applied by the Court in United States v. Globe Remodeling Co., 196 F. Supp. 652 (D. VT 1961), which involved a factual situation similar to the instant matter. In that case, the defendants were found liable for having fraudulently induced the Federal Housing Administration (FHA) to insure a home improvement loan. When the borrowers defaulted, the FHA was required to pay the lending institution. Subsequently, the borrowers fully repaid the government. Nevertheless, the Court held that the government's damages were the full amount of the "original loss" to the government occasioned by its payment to the lending institution. Id. at 657. The Court gave defendants credit for the repaid amounts, but only after doubling[1] the government's initial damages.

In Young Montenay v. United States, 15 F.3d 1040 (Fed Cir. 1994), the defendant falsely claimed progress payments for $49,000 in expenses it had not yet incurred. Because the work was subsequently performed, the defendant argued at trial that the government's damages were limited to lost interest on the early payments. The trial court disagreed and held that the government's damages were the full $49,000. On appeal, the Federal Circuit affirmed. Looking to the amount of money the government paid out at the time the fraudulent conduct occurred, the Court

---

[1] Under the pre-1986 version of the FCA, the government was entitled to double, rather than treble, damages.

CIVIL 05-1613CCC                                    11

concluded that the government "was denied the use of" the full amount of the false progress payments. Id. at 1043 & n.3.

As these cases make clear, the touchstone of FCA damages is the pay out of government funds as a result of the defendant's fraud. Once funds are fraudulently procured from the treasury, and are no longer available for use by the government, the United States has suffered a loss that gives rise to damages under the FCA. Such a rule recognizes the opportunity cost to the government due to the unavailability of these funds. This rule is also consonant with the FCA's "chief purpose of provid[ing] for restitution to the government of money taken from it by fraud." Hess, 317 U.S. at 551. It ensures that the government will be fully compensated for any fraud on the public fisc, and avoids subjecting the government's right of recovery to the unknown risks of future events. For this reason, courts have held that the government is entitled to damages under the FCA whenever it pays out money it would not have paid but for the defendant's fraud—regardless of any other recourse the government might possess to recoup the lost funds.

Here, it is undisputed that Alfonzo's and Morales' fraud caused the FSA to pay out at least $500,000 in an emergency loan and $13,534 in Livestock Indemnity Program funds it would not otherwise have disbursed. Accordingly, Alfonzo's and Morales' fraud caused the FSA to disburse $500,000 and $13,534 it would not otherwise had paid out. These payments constitute damages subject to the FCA's trebling provisions.

A logical and necessary corollary to the rule that FCA damages arise whenever the government is fraudulently induced to pay out money from the treasury, is the principle that any subsequent recoupment of those payments does not negate the government's claim for damages. This latter principle was expressly confirmed by the Supreme Court's seminal decision in United States v. Bornstein, 423 U.S. 303 (1976), where the Supreme Court held that a recoupment entitles the defendant to an offset once the government's damages are multiplied, but does not reduce the amount of the government's initial loss.

CIVIL 05-1613CCC                              12

In <u>Bornstein</u>, a subcontractor was found liable for causing the prime contractor to submit false claims to the United States for 397 radio kits that did not meet government specifications. Subsequent to the submission of the false claims, the government recouped from the prime contractor the cost of replacing most of the faulty radio kits. Both the trial court and the appellate court concluded that the government's damages should be reduced by the amount recouped from the prime contractor. The Supreme Court reversed. The Court held that, "in computing the double damages authorized by the Act, the Government's actual damages are to be doubled before any subtractions are made for compensatory payments previously received by the Government from any source." 423 U.S. at 316.

As <u>Bornstein</u> itself recognized, its rule on recoupment serves several beneficial purposes. First, the rule preserves the FCA's treble damages provision both as a deterrent against fraud and a vehicle for ensuring full restitution of the government's loss. If a defendant can "avoid the Act's [treble]-damage provision by tendering the amount of the [untrebled] damages at any time prior to judgment . . . this possibility would make the [treble] damage provision meaningless." 423 U.S. at 316. Second, multiplying damages before applying any offset is "consistent with the congressional judgment that [multiple] damages are necessary to compensate the Government completely for the costs, delays, and inconveniences occasioned by fraudulent claims." <u>Id.</u> at 530-31. Third, the rule "fixes the liability of the defrauder without reference to the adventitious actions of other persons." Thus, it ensures that "two [defendants] who committed similar acts and caused similar damage" will not be "subject to widely disparate penalties depending on whether and to what extent [a third party] ha[s] paid the Government." <u>Id.</u> Finally, <u>Bornstein</u>'s holding promotes mitigation of damages. The United States would have little incentive to pursue collection efforts if those efforts would nullify its right to claim treble (or any) damages.

In light of these considerations, any recoupment is to be credited only after the government's damages are multiplied. See <u>United States v. Ekelman & Associates, Inc.</u>, 532 F.2d 545, 549 (6th Cir. 1976); <u>United States v. Cabrera-Díaz</u>, 106 F.Supp.2d 234, 241 (D.P.R. 2000); <u>United States</u>

CIVIL 05-1613CCC                                     13

v. Entin, 750 F. Supp. 512, 519 (S.D. Fla. 1990); United States v. Hill, 676 F. Supp. 1158, 1182 (N.D. Fla. 1987); United States v. Canada, 425 F. Supp. 91, 92 (S.D. Ind. 1977); Globe, 196 F. Supp. at 657.  Significantly, nothing in these cases holds or suggests that Bornstein's recoupment rule turns on the nature or source of the particular recoupment.  Indeed, Bornstein itself forecloses such an interpretation.  Bornstein twice emphasized that its holding applies to subsequent payments received from the government "from any source."  423 U.S. at 316; see also Hill, 676 F. Supp. at 1182 ("The Government is entitled to damages . . . equal to triple the losses it actually incurred, reduced by payments received from any other source.")

In short, the government incurred damages when Alfonzo and Morales fraudulently induced the FSA to disburse $500,000 in a fraudulent emergency loan and $13,534 in the Livestock Indemnity Program, which funds the government "was denied the use of" until they were later partially repaid. Under Bornstein, belated repayment of these monies may entitle Alfonzo and Morales to a credit, but only after the government's damages are trebled.  This repayment does not entitle Alfonzo and Morales to turn back the clock and pretend that their fraudulent scheme–and the resulting $500,000 disbursement by the FSA–never occurred.

The False Claims Act also provides that a person who commits any of the acts specified in 31 U.S.C. §3729 (a) (1) - (7) is liable for a "civil penalty of not less than $5,000 and not more than $10,000."

The report of the Senate Judiciary Committee summarizes the law with respect to civil penalties as follows:

> The imposition of this forfeiture is **automatic and mandatory** for each claim which is found to be false. The United States is entitled to recover such forfeiture solely upon proof that false claims were made, without proof of any damages. Fleming v. United States, 336 F.2d 475, 480 (10th Cir. 1964), cert. denied, 380 U.S. 907 (1965). A forfeiture may be recovered from one who submits a false claim though no payments were made on the claim. United States v American Precision Products Corp., 115 F. Supp. 823 (D.N.J. 1953).

CIVIL 05-1613CCC                           14

> Each separate bill, voucher or other "false payment demand" constitutes a separate claim for which a forfeiture shall be imposed, see for example, United States v. Bornstein, 423 U.S. 303 (1976), United States v. Collyer Insulated Wire Co., 94 F. Supp. 493 (D.R.I. 1950), and this is true although many such claims may be submitted to the Government at one time. For example, a doctor who completes separate Medicare claim for each patient treated will be liable for a forfeiture for each such form that contains false entries even though several such forms may be submitted to the fiscal intermediary at one time.

S. Rep. No 345, 99th Cong., 2d Sess. 8-10 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5273-75.

As stated by Congress, the "United States is entitled to recover [civil penalties] solely upon proof that false claims were made, without proof of any damages." S. Rep. No. 345, 99th Cong., 2d Sess. 8 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5273. The primary cases concerning the issue are United States ex rel. Marcus v. Hess, 317 U.S. 537 (1943); Rex Trailer Co. v. United States, 350 U.S. 148 (1956); and United States v. Rohleder, 157 F.2d 126 (3rd Cir. 1946). See also In re Schemmels, 85 F.3d 416 (9th Cir. 1996).

The legislative history of the 1986 amendments makes clear that civil penalties are "automatic and mandatory for each claim which is false." S. Rep. No. 345, 99th Cong., 2d Sess. 8 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5273. Thus, up to a certain point, the number of civil penalties, or whether to even assess civil penalties, is not discretionary. "This forfeiture provision is mandatory; it leaves the trial court without discretion to alter the statutory amount." United States v. Hughes, 585 F.2d 284, 286 (7th Cir. 1978). The point at which a court may gain some discretion and limit the number of penalties is when the penalties are deemed "excessive." See United States v. Halper, 490 U.S. 435 (1989).

A reading of the complaint shows that Alfonzo and Morales submitted or caused to be submitted to the FSA at least one (1) false claim or statement in relation to or in support of the emergency loan application disbursed by said agency. Therefore, Alfonzo and Morales are exposed to a mandatory civil penalty between $5,000 to $10,000 under 31 U.S.C. §3729 (a) (1) - (7). Alfonzo is exposed to an additional mandatory civil penalty between $5,000 to $10,000 on

CIVIL 05-1613CCC                                              15

account of at least one (1) more false claim or statement in relation to the false statement on the application and/or certification to obtain monies from the FSA Livestock Indemnity Program.

In addition to treble damages and civil penalties, "[a] person violating this subsection shall also be liable to the United States Government for the costs of a civil action brought to recover any such penalty or damages." 31 U.S.C. §3729(a); see also BMY-Combat Systems Division of Harsco Corporation v. United States, 44 Fed.Cl. 141 (Fed. Cl. 1999).

III. JUDGMENT BY DEFAULT

Rule 55(b)(2) of the Federal Rules of Civil Procedure allow for the Court to enter judgment by default against any party who is in default and has failed to plead or otherwise defend as provided by said rule. Rule 55 does not require that testimony be presented as a prerequisite to entry of default judgment. See United States v Cabrera-Díaz, 106 F. Supp. 2d 234, 243 (2000).

IV. CONCLUSION

A review of the record and case law reveals that co-defendants Alfonzo, Morales and the conjugal partnership constituted by both have knowingly presented or caused to be presented false claims to the United States, and/or caused to be made or used false statements to get false claims paid or approved by the United States. The facts in this case are uncontested.

WHEREFORE, in view of the foregoing, plaintiff's Motion for Judgment by Default against co-defendants Alfonzo, Morales and the conjugal partnership constituted by both is GRANTED. Judgment shall be entered in plaintiff's favor and against co-defendants Alfonzo, Morales and the conjugal partnership constituted by both, jointly and severally, for treble damages sustained by the United States on account of the false claim/statement submitted in relation to the emergency loan disbursed for the amount of $500,000 which totals an aggregate amount of $1,500,000, less the amounts repaid to the United States for said emergency loan ($139,779.59), for a total net amount of **$1,360,220.41**, plus mandatory civil penalties against co-defendants Alfonzo, Morales

CIVIL 05-1613CCC                                                  16

and the conjugal partnership constituted by both, jointly and severally, in the amount of **$10,000.00** for the false statement or false claim submitted by Alfonzo and Morales to the FSA in relation to the emergency loan. Also, judgment shall be entered against co-defendant Alfonzo alone, in addition to the amounts specified above, for treble damages sustained by the United States on account of the false statement/claim submitted by him in relation to the Livestock Indemnity Program (LIP) in the amount of $13,534.00, which totals an aggregate amount of **$40,602.00**, with no credit to this amount since there has been no repayment to the United States on this item, plus an additional mandatory civil penalty against co-defendant Alfonzo alone, in the amount of **$10,000.00** for his false statement or false claim to the FSA on account of the Livestock Indemnity Program (LIP); plus costs. Judgment shall be entered accordingly.

   SO ORDERED.

   At San Juan, Puerto Rico, on September 18, 2006.

                                                   S/CARMEN CONSUELO CEREZO
                                                   United States District Judge